**LAW OFFICES OF MARK A. OSMAN**
**MARK A. OSMAN, ESQ.** (SBN 117455)
401 West A Street, Suite 1790
San Diego, CA  92101
Telephone:   (619) 231-8862
Facsimile:    (619) 231-3480
Email: Mark@osmanlawfirm.com

Attorney for Plaintiff
BRIAN J. ZOTTI, an individual

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| BRIAN J. ZOTTI, an individual, | Case No: **'16CV0322 CAB DHB** |
|---|---|
| Plaintiff, | **COMPLAINT FOR WHISTLEBLOWER RETALIATION IN VIOLATION OF SARBANES-OXLEY ACT** |
| vs. | |
| BRIDGEPOINT EDUCATION, INC., ASHFORD UNIVERSITY, a California LLC; and DOES 1 through 10, | |
| Defendants. | **JURY TRIAL DEMANDED** |

Plaintiff BRIAN J. ZOTTI, demanding a jury trial, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge.

## JURISDICTION AND VENUE

1.     This action arises under the whistleblower protection provisions of the Sarbanes-Oxley Act, 18 U.S.C. §1514A *et seq*. and as amended within the whistleblower protection provisions of the Dodd-Frank Act, 15 U.S.C. §78 (u) *et*

1

COMPLAINT FOR WHISTLEBLOWER RETALIATION IN VIOLATION OF
SARBANES- OXLEY ACT

*seq.* Jurisdiction is involved pursuant to 28 U.S.C. §1331, as well as under 28 U.S.C. §§2201. This suit is authorized and instituted pursuant to the above federal statutes. The jurisdiction of the Court is invoked to secure protection of and to redress deprivation of rights secured by the Sarbanes-Oxley Act and the Dodd-Frank Act.

2.     Venue is proper under 28 U.S.C. §1391 because principal places of business of the corporate defendants respectively are in this district. Venue is also proper because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

## PARTIES

3.     Plaintiff Brian J. Zotti (hereinafter, "ZOTTI" or "Plaintiff") now resides in Philadelphia County, Pennsylvania. ZOTTI was jointly employed by Bridgepoint Education, Inc. (hereinafter "BRIDGEPOINT") and Ashford University, a California LLC (hereinafter "ASHFORD") (sometimes collectively "Defendants") from October 28, 2013 until February 19, 2015. ZOTTI held the position of senior vice president, student services and operations.

4.     At all material times to this action, ZOTTI reported to Stephen Quattrociocchi (hereinafter, "COO Q") the chief operating officer of Defendant ASHFORD. As the facts below shall demonstrate, ZOTTI reasonably believed he uncovered perceived violations under Sarbanes-Oxley by Defendants, appropriately went up the chain of command to notify Defendants' management team, and in all respects tried to have Defendants comply with statutory requirements. Plaintiff was repeatedly threatened, harassed, and ultimately fired for trying to do the right thing in retaliation for his protected reporting activities.

5.     Defendant BRIDGEPOINT is a publicly traded Delaware corporation (©"BPI") for-profit provider of post-secondary educational services. At all material times to this action, BRIDGEPOINT's academic institutions included its

2

COMPLAINT FOR WHISTLEBLOWER RETALIATION IN VIOLATION OF SARBANES- OXLEY ACT

wholly owned subsidiary Defendant ASHFORD and the University of the Rockies (hereinafter, "UR"). Approximately 90% of BRIDGEPOINT's revenues are derived from ASHFORD. BRIDGEPOINT and ASHFORD have their headquarters at separate locations (about 11 miles apart) in San Diego County, California. UR had its principal place of businesses in Colorado Springs, Colorado. ASHFORD offers courses online and a relative few number of BRIDGEPOINT students were at a physical campus in Clinton, Iowa.

6. Defendant ASHFORD is a wholly-owned subsidiary of defendant BRIDGEPOINT.

7. Plaintiff is informed and believes and thereon alleges that Defendants knowingly and willfully acted in concert, conspired together and agreed among themselves to enter into a combination and systemized campaign of activity to cause the injuries and damages herein after alleged, and to otherwise consciously and or recklessly act in derogation of Plaintiff's rights, and the trust reposed by Plaintiff in each of said Defendants, said acts being negligently and/or intentionally inflicted. Said conspiracy, and Defendants' concerted actions, were such that, to Plaintiff's information and belief, and to all appearances, Defendants represented a unified body so that the actions of one defendant as accomplished in concert with, and with knowledge, ratification, authorization and approval of each and every defendant.

8. Plaintiff is informed and believes, and thereon alleges, that each and every defendant named in this Complaint, including DOES 1 through 10, inclusive, is and at all times mentioned herein was the agent, servant, alter ego, and/or employee of each of the other defendants and that each defendant was acting in the course of scope of his, her or its authority as the agent, servant, and/or employee of the other defendants. Consequently, each and every defendant is jointly and

3

COMPLAINT FOR WHISTLEBLOWER RETALIATION IN VIOLATION OF SARBANES- OXLEY ACT

severally liable to Plaintiff for the injuries sustained and damages incurred as a proximate result of their conduct.

EXHAUSTION OF REMEDIES

9.    Plaintiff timely filed a complaint with the United States Department of Labor, Occupational Safety and Health Administration (hereinafter "Fed-OSHA"). More than 180 days has elapsed since his filing the complaint with Fed-OSHA. Plaintiff has therefore exhausted his administrative remedies.

FACTUAL ALLEGATIONS

10.    ZOTTI is a 39 year old male. ZOTTI's initial annual salary with Defendants was $205,000.00, later raised to $212,000.00 as a result of his competent job performance. In 2015, ZOTTI was also eligible for an annual bonus (of which approximately $55,000 was never paid, despite it being earned), stock options and related executive benefits.

11.    On May 2, 2014, the Securities Exchange Commission (hereinafter "SEC") informed BRIDGEPOINT that a reassessment of their revenue recognition policy was necessary. Specifically, the SEC required Defendants to reassess whether collectability is reasonably assured on a student-by-student basis when recognizing revenue subsequent to a student's initial enrollment with BRIDGEPOINT's institutions upon certain changes in circumstances, such as when a student loses financial aid eligibility.

12.    On May 12, 2014, BRIDGEPOINT issued a press release disclosing the aforementioned directive from the SEC, and announcing that the company would be unable to timely file its quarterly report for the 2014 fiscal year. BRIDGEPOINT preliminarily estimated that application of a student-by-student reassessment during the quarter, ended March 31, 2014, resulting in a decrease in revenue and bad debt expense of $0.7 million and $0.2 million, respectively.

///

4

COMPLAINT FOR WHISTLEBLOWER RETALIATION IN VIOLATION OF SARBANES- OXLEY ACT

13. On May 30, 2014, BRIDGEPOINT filed a current report with the SEC on Form 8-K announcing that the company's management had determined that its financial statements filed with the SEC the years ended December 31, 2011 and December 21, 2012, as well as the financial statements issued for the quarters ended March 31, 2012, June 30, 2012, and September 30, 2012, should no longer be relied upon. According to the company, these financial statements contained errors related to revenue recognition that resulted in material misstatements of revenue, bad debt expense and accounts receivable. Specifically, BRIDGEPOINT disclosed that its process for analyzing the collectability criterion for revenue recognition was not designed appropriately to reassess collectability of funds owed by students, on a student-by-student basis, throughout the period that revenue was recognized by the company's institutions. In addition, BRIDGEPOINT disclosed that it had failed to maintain effective internal financial controls over the presentation of certain funds as restricted cash.

14. The market reaction to BRIDGEPOINT's disclosures of May 12, 2014 and May 30, 2014 was modest, because the impact on net income and earnings was quite modest. This was the case because, in substance, the company replaced its earlier practice of (1) recognizing revenue that might not be collectible but contemporaneously booking a bad debt reserve, with (2) not recognizing uncollectible revenue in the first place.

15. In June 2014, Defendants announced through ASHFORD Chief Operating Officer Steve Quattriocchi ("COO Q") that the internal accounting controls related to the Defendants' budgeting process would entail a more accurate and timely experience. COO Q joined ASHFORD in December 2013 upon ZOTTI's recommendation to hire him. COO Q was at all material times to this action ZOTTI's immediate supervisor. In order to provide accurate financial public reporting, particularly involved with financial forecasts, ZOTTI was the

5

COMPLAINT FOR WHISTLEBLOWER RETALIATION IN VIOLATION OF SARBANES-OXLEY ACT

executive primarily responsible for analyzing the forecasting of student retention figures, student reentries, break rates and related areas. These areas were of great concern (and part of ZOTTI's expressed job responsibilities) as Defendants' operating and financial results must be in line with internal expectations leading up to publicly announced quarterly results. Particularly significant for these financial projections were student retention and reentry rates quantified by ZOTTI and others.

16. In the past, Defendants were criticized by the "WASC" (Western Association of Schools and Colleges) accreditation body for inadequate data controls regarding its student retention and completion rates. Under these circumstances, Defendants' inaccurate public comments regarding financial forecasts could lead an investor to assume that Defendants were accurately depicting figures such as student retention rates. In this regard, once Defendants make public comments regarding student retention or total student enrollment (which reporting directly relates to BRIDGEPOINT's revenue recognition), they have a duty to speak completely and truthfully so as not to omit material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading.

17. In October 2014, ZOTTI inquired to COO Q to provide ZOTTI a draft internal accounting budget which in part addressed projected student retentions/reentries. COO Q instructed ZOTTI not to change the "net active" student enrollment number projected which meant ZOTTI could not provide accurate internal accounting figures. Significantly, these accounting figures would ultimately merge into BRIDGEPOINT's publicly announced financial forecasts to shareholders.

18. ZOTTI recognized a requirement in accurately determining the projected active number of students enrolled (the figures which directly impacted

6

COMPLAINT FOR WHISTLEBLOWER RETALIATION IN VIOLATION OF SARBANES- OXLEY ACT

Defendants' publicly announced financial projections), they must take into account a newly adopted university policy called the "3 Unsuccessful Grade Policy" ("3 UG"). The 3UG policy provided that the number of courses the Defendants allowed a student to fail before initiating their removal from classes was three (3), the maximum number of courses for which Defendants could apply federal loans and/or grants. It is important to note that a student would become ineligible for federal Title IV funds (grants and loans) if the student failed to receive credit or failed to pass three consecutive courses.

19.  With raw data compiled by Defendants' university research team and analytics personnel, ZOTTI determined that Defendants' internal accounting controls projecting the student retention rates in light of the 3UG policy were materially misleading as they resulted in inaccurate projected financial results within the budget accounting. When ZOTTI confronted COO Q with his perceived conclusions resulting from material weaknesses and flaws in Defendants' internal accounting processes, COO Q responded "it's a little late to be raising these issues" or words to this effect.

20.  Previously, ZOTTI had emailed COO Q, Vice President of Finance Jim Smith ("VP Finance Smith"), cabinet members and ASHFORD's President Dr. Richard L. Pattenaude ("Pres. Pattenaude") regarding the material operational financial risks associated with inaccurately projecting student retention and/or student reentry rates. Pres. Pattenaude claimed that he wanted to share these concerns with BRIDGEPOINT Chief Executive Officer Andrew S. Clark ("CEO Clark").

21.  Upon being confronted with ZOTTI's conclusions regarding materially inaccurate student retention/reentry rates within Defendants' internal financial controls, COO Q became agitated and in a hot tempered voice exclaimed "that's big (student enrollment shortfall), Big! Brian we agreed already. You, me,

7

COMPLAINT FOR WHISTLEBLOWER RETALIATION IN VIOLATION OF SARBANES- OXLEY ACT

Jim (VP Finance)." ZOTTI responded, "No Q, I didn't agree. I asked for the financial budget numbers to look at because I was given something (the budget) to move the risk around and didn't weigh in on the budget being built" or words to this effect.

22.    COO Q then heatedly stated,

> This can't be right, you have us missing (student enrollment) by 3000-5000 students. **(This factor would reflect millions in lower corporate revenue and reduced profitability to report publicly in 2015.)** You want to be responsible for a RIF (reduction in force), [be]cause that's what you are saying will happen. Nice. (emphasis added).

23.    COO Q inquired to VP Finance Smith "Jim, take a look at this. What do you think?" Smith had a worried look on his face and replied, "I need to take a look but most definitely these losses [lower student enrollment figures] hurt us."

24.    The next day, ZOTTI and COO Q had a telephone conference. COO Q stated, "just wanted to say I shouldn't have put this all on you [projected student enrollment figures]. I shouldn't have said that you would cause a RIF (reduction in force) because that's not fair." ZOTTI responded, "It's not that I want to have the students drop and it's not me that drove the policy change (3UG)." In any event, despite this notice, COO Q did not seek to reasonably correct the total projected enrollment count within the company's financials.

25.    COO Q replied, "I just need you to say the budget is finished. I'll say we have a few things to smooth out but that it is done. We can reforecast financial projections at the end of February." ZOTTI replied, "I cannot confirm the budget is done if I believe there are thousands of (student) drops unaccounted for." COO Q replied, "They will reopen the entire budget process and that's the last thing we need them to do." Ultimately, COO Q announced at an ASHFORD high level meeting that the financial budget accounting process has been wrapped up and ZOTTI realized Defendants had not taken into account that the data to be

8

COMPLAINT FOR WHISTLEBLOWER RETALIATION IN VIOLATION OF SARBANES- OXLEY ACT

incorporated in Defendants' publicly announced financial projections was false and/or misleading.

26. In late 2014, ZOTTI's immediate subordinate, divisional vice president, student services and operations Peter Nevins ("Nevins"), separately reported that the internal financial accounting for student drops was severely under-reported by Defendants' management. (Nevins has also filed with the Fed-OSHA a whistleblower retaliation claim against Defendants). Nevins reported to his direct supervisor ZOTTI and VP of Finance Smith that not accurately accounting for the projected drop in student retention/reentry numbers was materially misleading as to Defendants' forecasted financial condition, or words to this effect. ZOTTI (and Nevins) had concluded that COO Q's failure to accurately depict the thousands of additional student drops would have far reaching implications for the corporate financial and public reporting of Defendants' financial forecasts. ZOTTI confirmed to Nevins that COO Q threatened his job security if he refused to go along with the perceived false, misleading and inaccurate financial projections.

27. VP of Finance Smith approached Nevins in late 2014 to inform Nevins that Smith could lose his job unless the budget projections regarding student enrollment were resolved. Indeed, VP of Finance Smith came to Nevins' office to urge Nevins to convince ZOTTI to "sign off" on the management backed internal budget accounting retention projections. Smith informed Nevins that the executive bonuses were tied to the budget financial accounting and the ultimate projected student enrollment numbers submitted. Apparently, the incentive of receiving executive bonuses outweighed the necessity to accurately report Defendants' projected financial condition to the public.

28. Despite the pressure to "cook the books," Nevins informed VP of Finance Smith that there was no basis for him or ZOTTI to agree with the student

9

COMPLAINT FOR WHISTLEBLOWER RETALIATION IN VIOLATION OF SARBANES- OXLEY ACT

enrollment projection scenarios based upon the known data. Nevins asserted that the student retention/reentry figures generated by ZOTTI and him were personally verified and indeed only reflected a portion of the known student retention risks.

29. Thereafter, Nevins met with VP of Finance Smith and an associate director Kevin Nolan to reiterate ZOTTI's (and his) stance that the current budget financial accounting as adopted was materially inaccurate. VP of Finance Smith stated that if ZOTTI (and Nevins) would not sign off on the figures, they would remain unchanged with an eye toward a review in February 2015.

30. In a follow-up meeting in late 2014, ZOTTI more clearly defined for COO Q that the financial projections sought to be adopted in the 2015 budget financial accounting were false and/or misleading to the extent the student retention/reentry numbers failed to take into account various risk factors and empirical data recorded. The most notable error in the budget accounting was that the new 3UG policy effect was not being fully accounted for in the financial data.

31. On November 5, 2014, CEO Clark, CFO Dan Devine, and other BRIDGEPOINT officers participated in a conference call with the release of financial results for the quarter ending September 30, 2014. CEO Clark indicated that BRIDGEPOINT was expecting new enrollments to be positive throughout 2014, and total enrollments to "turn positive" (i.e., start increasing) during the second half of 2015. CEO Clark stated in part:

> [W]e anticipate new enrollments will be positive throughout next year, and total enrollments will turn positive in the second half of the year. We currently view 2014 earnings as the bottom. With these positive student outcomes and a continued focus on operational efficiencies, we are focused on improving our operating margins in 2015, and our longer-term goal of EBITDA margin remains in the mid-teens. Throughout 2015, we will continue to review our uses of our cash balances and auctions for enhancing shareholder value, including acquisitions that would meaningfully diversify Bridgepoint Education, share repurchases and other value-creating opportunities.

10

COMPLAINT FOR WHISTLEBLOWER RETALIATION IN VIOLATION OF SARBANES- OXLEY ACT

32. In fact, ZOTTI's internal analyses pertaining to the 3UG Policy indicated that the publicly announced projected flat or improved enrollment for 2015 was not reasonably possible. The foregoing financial guidance as to Defendants' 2015 enrollments was not reasonably achievable at the time it was publicly provided. Since revenues booked in the recently concluded Q3 2014 were dependent upon achieving the forecasted student retention (and concomitant collection of tuition revenues pertaining to those students) over the next year, those projected revenues were in all reasonable likelihood overstated.

33. In December 2014, CEO Clark addressed Defendants' executives at an operations meeting, "Okay. Thank you all for a good year. Do we have the budget set for next year?" COO Q replied, "Yes we do Andrew. We are all set."

34. In early January 2015, ZOTTI's expectations were coming to fruition as an approximately 8,000—10,000 drop in total student enrollment could be accurately assumed on an annual basis upon interpreting the Defendants' internal data. During an operations meeting, COO Q referred to ZOTTI's failures to adopt the budget accounting numbers as a "career limiting move." ZOTTI was asked by a colleague, "What was that comment all about?"

35. ZOTTI and Nevins discussed privately what needed to be done to prevent the subjectively perceived potential illegal conduct of Defendants materially overestimating the company's projected revenue figures and projected profits, which were directly tied to accurately projecting total student enrollment and retention figures. ZOTTI and Nevins together reviewed the November 12, 2014 BRIDGEPOINT Employee Handbook section entitled "Whistleblower Policy." ZOTTI and Nevins discussed the possibility that Defendants might retaliate against them for their whistleblowing activities.

36. ZOTTI and Nevins decided that the false and/or misleading budget accounting figures would need to be discussed with Mark Johnson, Defendants'

11

COMPLAINT FOR WHISTLEBLOWER RETALIATION IN VIOLATION OF SARBANES- OXLEY ACT

Chief of Compliance. ZOTTI informed Chief of Compliance Johnson that ZOTTI's resistance to adopting the misleading budget financial accounting figures resulted in COO Q threatening his job security with witnesses present. ZOTTI shared that COO Q also claimed that ZOTTI's budget input would lead to a company-wide reduction in force around the holiday season. ZOTTI communicated to Johnson his belief that the false and/or misleading financial information would flow through to CEO Clark's publicly announced comments. It was mentioned that CEO Clark was challenged by a stock analyst during BRIDGEPOINT's last quarter's earnings call for allegedly inaccurate previously-announced total student enrollment forecasts.

37. Significantly, Chief of Compliance Johnson informed ZOTTI during this meeting that ZOTTI's reporting activity protected him as a "whistleblower." Chief of Compliance Johnson asked ZOTTI his recommendations under the circumstances. ZOTTI opined that there was a need to have an audit conducted to perform a review of the budget financial accounting and its assumptions. Chief of compliance Johnson thanked ZOTTI and stated that he would speak with BRIDGEPOINT's senior vice-president and chief legal counsel, Diane Thompson. Despite chief of compliance Johnson informing ZOTTI he would keep his name confidential, ZOTTI was shortly thereafter summoned to chief of compliance Johnson's office to openly discuss the nature and extent of ZOTTI's whistleblower activities.

38. Chief Compliance Johnson informed ZOTTI the following week that SVP Thompson and Johnson felt that the audit process would take too long and Johnson and Thompson agreed that ZOTTI should draft some pertinent questions to be presented at a corporate high level meeting. Despite ZOTTI's efforts in providing pertinent questions, this suggested course of action never took place as the questions were never utilized by Defendants' management.

12

COMPLAINT FOR WHISTLEBLOWER RETALIATION IN VIOLATION OF SARBANES- OXLEY ACT

39.    ZOTTI on many occasions (not all identified within this Complaint) expressed via phone and face-to-face meetings serious concerns to multiple members of Defendants' top management team that Defendants' would fail to accurately report financial information in upcoming quarters based upon the events observed by ZOTTI with regard to the under reporting of projected student retention figures.

40.    ZOTTI engaged in protected reporting activities when he reported what he subjectively believed were violations (or were in the beginning stages of occurring) of any rule or regulation of the Securities and Exchange Commission, or any provision of federal law relating to fraud. ZOTTI also reported that material weaknesses existed in the internal budget controls environment that could lead to inaccurate disclosures of Defendants' financial information shared with the public.

41.    During this immediate timeframe shortly before facing additional retaliation, there were no written warnings communicated to ZOTTI regarding his job performance and behavior and/or any performance improvement plan imposed. ZOTTI was showered with praise regarding his job performance.

42.    Despite his outstanding job performance, from early January until his termination, ZOTTI encountered disparate treatment, threats, intimidation and related retaliatory conduct by Defendants' management team members as a direct result of his protected SOX reporting activities.

43.    In early February 2015 Nevins was requested to send to VP Smith his recommendation as to the latest budget figures as ZOTTI was off site.  Nevins reported that the budget figures scenarios severely underestimated student drops.

44.    On February 18, 2015, EVP Smith entered ZOTTI's office with documentation that reflected three (3) budget scenarios for ZOTTI to choose from with regard to his financial projections regarding student retention/reentry numbers for 2015.

COMPLAINT FOR WHISTLEBLOWER RETALIATION IN VIOLATION OF SARBANES- OXLEY ACT

45.    On February 19, 2015, Pres. Pattenaude and Kendra Myers, VP of Human Resources ("Meyers") entered ZOTTI's office. ZOTTI was terminated from his employment effective immediately. Pres. Pattenaude and Meyers were for the most part reading from Defendants' standard "termination script." ZOTTI responded "What did I do wrong or not do?" Pres. Pattenaude replied, "You've become a liability." ZOTTI then realized that his SOX whistleblowing activities were a contributing factor for his wrongful termination. At that point, Meyers asked the president to leave the meeting. She commented, "I don't know why he did that (mentioned liability comment)." Meyers claimed she didn't know why ZOTTI was terminated but in any event, she suggested he ask for a larger severance. Defendants sought to shield themselves from liability for their misconduct by offering ZOTTI a severance package in exchange for a General Release. This tactic was rejected by ZOTTI.

46.    Significantly, Nevins was also wrongfully terminated the same day without any reason given for his termination. Unlike ZOTTI, Nevins was not offered a severance. The terminations were obviously retaliatory in light of ZOTTI/Nevins' efforts to do the right thing with regard to reporting perceived financial improprieties under SOX.

47.    In ZOTTI's December 2014 performance evaluation, ZOTTI's stellar job performance is described without reservation. On February 19, 2015, ZOTTI is terminated for allegedly being a "liability," while on December 18, 2014, COO Q commented within ZOTTI's Annual Review the following:

> This is Brian's most important goal and he has shown remarkable progress quickly and at a critical time. I am thankful to have him leading us in this regard. Keep it up!

> Brian is a massively intelligent and driven executive and a valuable member of our team here at Ashford. I look forward to continued partnership and mutual development as we take Ashford forward together.

14

COMPLAINT FOR WHISTLEBLOWER RETALIATION IN VIOLATION OF SARBANES- OXLEY ACT

Brian is massively competent, but I do not have competencies to grade here in this profile ("year-end comments" section of review).

48. On or about December 23, 2014, Pres. Pattenaude exclaimed in ZOTTI's Annual Evaluation:

I concur with Q. Brian has done a tremendous amount [sic] of valuable work. We do need to continue mentoring him on managing a large group. Luckily he is very open to constructive discussion and feedback. He is a good colleague.

49. On or about March 10, 2015, approximately three weeks following ZOTTI's (and Nevins') wrongful termination, CEO Clark and other BRIDGEPOINT officers participated in a publicly available conference call in connection with the release of financial results for the quarter ending December 31, 2014. CEO Clark indicated that BRIDGEPOINT was expecting that total student enrollments would be flat, or grow slightly, in 2015, which directly contradicted the information provided to Defendants' management team by ZOTTI. CEO Clark stated, in part:

Overall in 2014, we saw concrete evidence that our strategies, hard work, and investments are paying off for students. Our efforts to improve student and educational quality have produced results and we attribute some of Ashford's strong inquiring and application flows to our brand recognition efforts. We associate both of these with higher quality students who retain longer and higher new enrollments at Ashford.

We've also had good results with retention. Over each of the past three quarters we have reported to you the annual retention of students who are active in the year ago quarter, or who have graduated during that time. Now, for the fourth quarter of 2014, I'm pleased to report that this statistic was again up very meaningfully, reaching 65.1% in the quarter, a significant improvement of 330 basis points over the 61.8% retention in the fourth quarter of 2013. The retention improvement throughout 2014 reflects the success of the student preparedness and quality initiatives we have implemented.

/ / /

15

COMPLAINT FOR WHISTLEBLOWER RETALIATION IN VIOLATION OF SARBANES- OXLEY ACT

> **Based upon what we've experienced in 2014 and our growth priorities for 2015, we anticipate new enrollments will show modest positive growth in 2015. We expect total enrollments throughout 2015 will be approximately flat compared to ending enrollments in 2014.** This means that average total enrolments for 2015 will be lower than average total enrolments in 2014, which will result in lower revenue for 2015. We anticipate that this decline in revenue will be fully offset by lower expenses resulting from the cost adjustments we made in 2014 and lower average new enrollments throughout 2015. (emphasis added).

50.     As noted above, with respect to Q3 2014, the internal analyses pertaining to the 3UG Policy, as well as the known control gap relating to financial aid availability of incoming students, indicated that flat or improved enrollment for 2015 was not reasonably possible. The foregoing guidance as to 2015 enrollments was not achievable at the time it was provided. Since revenues booked in the recently concluded Q4 2014 were dependent upon achieving the forecasted retention (and concomitant collection of tuition revenues pertaining to those students) over the next year, those revenues were necessarily overstated.

51.     In the quarters ending March 31, 2015 (results announced May 5, 2015) and June 30, 2015 (results announced August 5, 2015), Defendants announced further declines in total enrollment from 55,823 and 51,049 students, respectively, and continued year-over-year declines in quarterly revenues and income. The enrollment declines are in line with the internal estimates performed by ZOTTI and others at ASHFORD between July 2014 and February 2015. BRIDGEPOINT stock has declined to a price of $6.40 per share as of February 5, 2016 from a share price of approximately $4.00 a year prior. If BRIDGEPOINT had been truthful about prospective student enrollment, and the collectability of tuition obligations, its stock price would have fallen to that lower level much earlier.

52.     For the quarterly period ending September 30, 2015, Defendants filed a current report on Form 10Q with the SEC. The 10Q stated in part:

16

COMPLAINT FOR WHISTLEBLOWER RETALIATION IN VIOLATION OF SARBANES- OXLEY ACT

> Our revenue for the nine months ended September 30, 2015 was $430.3 million, representing a decrease of $61.1 million or 12.46%, as compared to revenue of $491.4 million for the nine months ended September 30, 2014.  The decrease between periods was primarily due to the 16.1% decrease in ending student enrollment at our academic institutions, from 59,552 students at September 30, 2014 for 49, 982 students as of September 30, 2015.

53.     ZOTTI's insistence that Defendants' public announcements reasonably take into account the expected decrease in student enrollment fell on deaf ears.  Ultimately, ZOTTI's enrollment projections were proved accurate as revealed by the student enrollment numbers announced to the public during 2015 following ZOTTI's retaliatory termination by Defendants.

54.     The aforementioned Defendants' report on Form 10Q filed on with the SEC also included a damaging admission as to the underlying circumstances of ZOTTI's wrongful termination in that Defendants conceded that there was a material weakness in Defendants internal controls over financial reporting:

> The control deficiencies that gave rise to the material weaknesses could result in a material misstatement of our annual interim financial statements that would not be prevented or detected and corrected on a timely basis.

55.     In summary, Plaintiff was wrongfully terminated in retaliation for his perceived reporting activities under SOX as amended.

## COUNT 1
### Sarbanes-Oxley Whistleblower Retaliation
### Sarbanes-Oxley Act of 2002, as amended, 18 U.S.C. §1514A, *et seq.*

56.     ZOTTI hereby incorporates all allegations set forth in all the foregoing paragraphs as though fully alleged herein.

57.     Section 806 of SOX applies to any publicly traded company that holds a class of securities registered under Section 12 of the Exchange Act or any publicly traded company that is subject to the periodic reporting requirements of

17

COMPLAINT FOR WHISTLEBLOWER RETALIATION IN VIOLATION OF SARBANES- OXLEY ACT

Section 15(d), or any officer, employee, contractor, subcontractor or agent of such company.  18 U.S.C. §1514A(a).

58.     BRIDGEPOINT is a publicly traded company that holds a class of securities registered under §12 of the Securities Exchange Act of 1934 (15 U.S.C. §781).  BRIDGEPOINT is thus required to file reports under Section 15(d) of the Securities Exchange Act.

59.     ZOTTI is a covered employee under SOX.

60.     Section 806 of SOX protects employees who engage in protected conduct by "provid[ing] information, caus[ing] information to be provided, or otherwise assist[ing] in an investigation regarding any conduct which the employee reasonably believes constitutes" securities fraud, wire fraud, bank fraud, or violation of "any rule or regulation of the Securities and Exchange Commission, or any provision of Federal law relating to fraud against shareholders."  18 U.S.C. §1514A(a)(1).

61.     At all material times Section 806 of the Sarbanes Oxley Act of 2002 was in effect and binding on Defendants.  It prohibits employers such as Defendants from discharging, constructively discharging, demoting, threatening, harassing or in any manner discriminating or retaliating against any employee because he or she provided information, caused information to be provided, or assisted in an investigation by a federal regulatory or law enforcement agency, or an internal investigation by the company relating to alleged mail fraud, wire fraud, bank fraud, securities fraud, violations of SEC rules and regulations or violations of federal law relating to fraud against shareholders.  If an employer takes retaliatory action against an employee because he or she engaged in any of these protected activities, the employee can file a complaint with the Secretary, United States Department of Labor, Occupational Safety and Health Administration.

/ / /

18

COMPLAINT FOR WHISTLEBLOWER RETALIATION IN VIOLATION OF SARBANES- OXLEY ACT

62. Plaintiff timely filed a whistleblower complaint with Fed-OSHA, and 180 days have elapsed since filing that complaint. No decision has been issued by Fed-OSHA, and Plaintiff has not been the cause of any delay in the issuance of a decision. Accordingly, Plaintiff is entitled to seek relief in district court by jury trial. Moreover, no pre-dispute arbitration agreement shall be valid or enforceable, if the agreement requires arbitration of a dispute arising under this section of SOX.

63. Engaging in protected activity under Section 806 of SOX does not require an employee to report fraud, but only to disclose conduct he reasonably believes may violate any SEC rules or regulations, or any federal statute relating to fraud or disclose inadequate financial controls maintained by Defendants.

64. ZOTTI reasonably believed and reported to his supervisors and others that the conduct of Defendants constituted a potential violation of federal securities laws and regulations under the SEC and/or a federal statute relating to fraud. ZOTTI also reported to Defendants' management that material weaknesses existed in the Defendants' internal budget control environment that could lead to inaccurate disclosures of Defendants' financial information shared with the public.

65. In this regard, Sections 302 and 404 of SOX require Defendants' management to establish and maintain an adequate internal control structure and procedures for financial reporting. To reiterate, Defendants have conceded publicly that there existed at relevant times to this case material weaknesses in their internal financial controls environment.

66. In the annual 10-K report for the year ended December 31, 2014, and in compliance with the Sarbanes-Oxley Act of 2002, both CEO Clark and Daniel J. Devine, CFO, certified the company's financial statements and their responsibility for establishing and maintaining disclosure controls and procedures and internal control over financial reporting.

///

19

COMPLAINT FOR WHISTLEBLOWER RETALIATION IN VIOLATION OF SARBANES- OXLEY ACT

67.   Based upon the foregoing, Plaintiff engaged in protected activities under SOX.  Under the circumstances, it was also reasonable for ZOTTI to believe he was engaged in a protected activity when he reported to his immediate supervisor COO Q, VP of Finance Smith, and other members of BRIDGEPOINT and ASHFORD management teams on numerous occasions, that ASHFORD's student retention and reentry rates were materially inaccurate and would affect BRIDGEPOINT's projections of total student enrollment and revenue and profit projections.  Moreover, it was reasonable for ZOTTI to have disclosed to management that the inaccurate projections were the result of deficiencies in the Defendants' internal processes and controls.  Accordingly, ZOTTI had both a subjective belief and an objectively reasonable belief that the conduct complained of constituted a violation of SOX.

68.   Since ZOTTI's job responsibilities included the development of student enrollment estimates and forecasts including retention figures, student reentries, break rates and related areas, information provided by ZOTTI to Defendants' management team had a direct bearing on the accuracy of revenue forecasts which are included in the budget.  Forecasts of revenue, student enrollment, student retention and other data are frequently referenced in reports and other communications by Defendants to the public and serve as guidance to investors or shareholders.

69.   When ZOTTI provided this information to COO Q and others, he stated it would result in missing their total student enrollment estimate by thousands of students.  ZOTTI recognized the material impact this would have on Defendants' future revenue, costs, cash flow and other financial information.

70.   It was reasonable for ZOTTI to believe that reporting this information was critical to accurate financial reporting and therefore was a protected activity under SOX.

20

COMPLAINT FOR WHISTLEBLOWER RETALIATION IN VIOLATION OF SARBANES- OXLEY ACT

71.    Defendants' management knew that ZOTTI engaged in protected activity under SOX. COO Q, in his capacity as Chief Operating Officer, VP of Finance Smith, Chief of Compliance Johnson, CEO Clark and Pres. Pattenaude should have known ZOTTI was engaged in a protected activity when he reported management's financial projections were based on inaccurate and misleading student retention and related total student enrollment information/projections.

72.    Defendants have also established a Code of Ethics.

73.    The Code of Ethics states: "It is the Company's intention that the Code be our written Code of Ethics under Section 405 of the Sarbanes-Oxley Act of 2002, and that it comply with the standards set forth in the Securities and Exchange Commission Regulation S-K Item 406, as well as Section 303A.10 of the New York Stock Exchange Listed Company Manual."

74.    Section 4 of the Code "The Company recognizes that the investment community derives information regarding the Company's financial condition primarily from the Company's filings with the Securities and Exchange Commission. To promote the transparency of its financial operations, the Company has a strict policy requiring that all filings with the Securities and Exchange Commission be fair, accurate, timely and understandable."

75.    The Code also protects individual employees who report what they believe to be ethical violations. "The Company does not permit retaliation of any kind against employees for good faith reports of ethical violations. Any employee who attempts to or encourages others to retaliate against an individual who has reported a violation will be subject to disciplinary action.

76.    Defendants' executives would have been expected to sign the Code of Ethics in accordance with the provisions of section 13 of the Code.

77.    Therefore, it would be reasonable to believe that COO Q and Chief of Compliance Johnson and other members of Defendants' management team should

21

COMPLAINT FOR WHISTLEBLOWER RETALIATION IN VIOLATION OF SARBANES- OXLEY ACT

have known that ZOTTI's actions were protected from retaliation by the company's Code of Ethics, BRIDGEPOINT's employee handbook, and Sarbanes-Oxley and therefore were protected activities.

78.     Based on the foregoing, it was reasonable for ZOTTI to subjectively believe he was involved in protected activity and such activity was a "contributing factor" in the termination of his employment.

79.     ZOTTI put Defendants on notice of the perceived unlawful conduct he believed to be in violation of securities laws and regulations when he notified persons within Defendants corporate entities who held supervisory authority over him and who had the authority to investigate misconduct.

80.     In violation of SOX, 18 U.S.C. §1514A, and in retaliation for ZOTTI's protected activity of reporting a reasonable belief that securities laws and regulations were being violated, Defendants took multiple adverse actions against ZOTTI for reporting his subjective and reasonable belief that securities laws and regulations were being violated.

81.     Defendants took adverse actions, such as harassment and threatened retaliation, against ZOTTI and they ultimately terminated him in response to their receiving notice of his protected activity under the Sarbanes-Oxley Act.

82.     For retaliation in violation of SOX, ZOTTI is entitled to such legal and equitable relief to effectuate the purposes of SOX, including, *inter alia*, employment reinstatement, back pay with interest, front pay, compensatory damages, reputational damage, emotional distress, and attorneys' fees and costs in amounts to be proven at trial.

/ / /

/ / /

/ / /

/ / /

22

COMPLAINT FOR WHISTLEBLOWER RETALIATION IN VIOLATION OF SARBANES- OXLEY ACT

## PRAYER FOR RELIEF

Wherefore, Plaintiff prays for judgment against Defendants as follows:

1.  For compensatory and special damages, including but not limited to lost wages (back pay/front pay), reputational injury, medical benefits, other employment benefits, and all relief necessary to make ZOTTI whole, according to proof;

2.  For general, mental, and emotional distress damages according to proof;

3.  For an award of interest, including prejudgment interest, at the legal rate;

4.  For an award of litigation costs, expert witness fees, and attorneys' fees;

5.  For costs of suit incurred;

6.  For declaratory judgment that the alleged arbitration agreement is invalid and prohibited under SOX as amended by and/or Dodd Frank; and

7.  For such other and further relief as the court deems just and proper.

DATED: February 9, 2016

LAW OFFICES OF MARK A. OSMAN

By: _____

Mark A. Osman
Mark@Osmanlawfirm.com
Attorneys for Plaintiff
BRIAN J. ZOTTI

23

COMPLAINT FOR WHISTLEBLOWER RETALIATION IN VIOLATION OF SARBANES- OXLEY ACT